UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| JEFFREY W. HOWARD, | ) |
| Plaintiff, | ) |
| v. | ) No.: 2:22-CV-134-KAC-CRW |
| CHEROKEE HEALTH SYSTEMS, | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION AND ORDER**

This action is before the Court on Defendant Cherokee Health Systems's "Motion for Summary Judgment" [Doc. 11]. Because there are no genuine disputes of material fact and Defendant is entitled to judgment as a matter of law, the Court **GRANTS** Defendant's "Motion for Summary Judgment" [Doc. 11].

### I.  **Background**[1]

#### A. **Plaintiff's Tenure At Cherokee Health Systems**

Plaintiff Jeffrey W. Howard began working for Defendant part time in college and was hired full time as controller in 1992 [Doc. 12 at 67 (Deposition of Jeffery W. Howard ("Howard Dep.") 13:21-23)]. Dr. Dennis Freeman hired Plaintiff, and Plaintiff reported to him [*Id.* (Howard Dep. 14:16-23)]. Freeman served as Defendant's Chief Executive Officer ("CEO") from 1978 until February 1, 2022 [*Id.* at 31 (10/26/2021 Cherokee Board of Directors Meeting Minutes ("10/26/2021 Board Meeting Minutes" at 3)]. By 2000, Plaintiff ascended to the position of Chief

---

[1] Because Plaintiff is the nonmoving Party, the Court describes the facts in the light most favorable to him.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

1

Financial Officer ("CFO") at Cherokee Health Systems, despite leaving temporarily for another position [*Id.* at 68 (Howard Dep. 14:4-23; 19:3-9)]. Plaintiff continued to serve as CFO, reporting to Freeman, until Plaintiff was terminated [*Id.* (Howard Dep. 19:13-15)].

Plaintiff believes that throughout Freeman's tenure, Freeman "protected" certain female employees, giving them his "favorite attention" [*Id.* at 70 (Howard Dep. 27:3-18)]. To Plaintiff, "it just seemed that everyone that was advanced was female" [*Id.* at 71 (Howard Dep. 32:7-8)]. Plaintiff points to Tracey Garner as one example [*See id.* (Howard Dep. 25:1-8)]. Freeman elevated Garner to "leader of" Defendant's "most complicated office and [Garner] did not have qualifications for that" [*Id.* at 69 (Howard Dep. 23:1-5)]. Plaintiff thinks "[t]here were probably multiple complaints" about Garner's performance, but "people could not discipline [her] because she would go straight to Dr. Freeman and get her way" [*Id.* (Howard Dep. 23:18-19; 24:6-8)]. Plaintiff believes Garner received this treatment because of an alleged affair with Freeman [*See id.* (Howard Dep. 24:11-17)].

Garner, however, recalls Freeman repeatedly attempting to hold her hand or kiss her in a work setting, despite her consistently telling him no [Doc. 20 at 31-32 (Deposition of Tracey Garner ("Garner Dep.") 18:18-20:14)]. And Freeman excluded Garner from an important business trip after she told him "to make sure that [they] had separate rooms" [*Id.* at 31 (Garner Dep. 17:8-13)]. Garner left Defendant's employ as part of a 2012 agreement to settle an Equal Employment Opportunity Commission charge she filed against Defendant regarding Freeman's conduct [*Id.* at 30 (Garner Dep. 9:3-9; 10:1-3; 12:25-13:15)]. But Garner confirmed that if someone crossed one of Freeman's "favored" employees, Freeman "would find a way to get rid of" that person [*Id.* at 36 (Garner Dep. 45:12-13)]. And in Garner's opinion, men simply could not have a "long-lasting role" at Cherokee Health Systems [*Id.* at 34 (Garner Dep. 33:1-2)].

2

Garner points to Freeman's wife—Rhonda Freeman—as an example of Freeman favoring certain females. [*Id.* at 34 (Garner Dep. 31:12-16)]. Freeman's relationship with his wife began as an office affair at Cherokee Health Systems [*See id.* at 33-34 (Garner Dep. 31:12-18)]. But Mrs. Freeman left her position at Cherokee Health Systems before she married Freeman in 2000 [*See id.* at 47 (Howard Dep. 82:16-25; 83:1-8)]. And as another example, Plaintiff recalls that after Freeman and Plaintiff conducted an interview of Stephanie Hall, a potential hire who was female, Freeman commented "I don't know whether to hire her or date her" [*See* Doc. 12 at 71 (Howard Dep. 32:9-12)].

Plaintiff states that not "all [of Freeman's] favoritism was sexual" [*Id.* at 70 (Howard Dep. 28:16-17)]. From Plaintiff's perspective, "[i]f [the female employees] were overweight," then Freeman "would bash them every chance he got" [*Id.* (Howard Dep. 28:19-20]. During Plaintiff's tenure with Defendant, he never communicated to anyone that he believed Freeman was discriminating on the basis of sex [*See* Doc. 12 at 73 (Howard Dep. 37:6-23)].

### B. Freeman's Resignation

As early as 2019, Freeman was preparing Defendant's Chief Clinical Officer, Parinda Khatri a female, to take over as CEO [*See id.* at 75 (Howard Dep. 49:23-25; 50:1-14)]. Plaintiff initially encouraged Freeman to elevate Khatri to Deputy CEO [*See id.* (Howard Dep. 49:3-7)]. In April 2019, Plaintiff wrote to Freeman that he "used to want to try [his] hand at CEO" but he "learned more over the last few years" and saw that he was "probably not the best choice[]" [*See id.* at 47 (4/16/2019 Email between Howard and Freeman)]. Plaintiff explained that Khatri "may not know everything about contracts and business but those are easier gap [sic] to fill" and assessed that Khatri "will be great but I think laying out a formal transition would go a long way" [*Id.*]. Plaintiff also assessed that Freeman had a strong "bias toward having a clinician," like Khatri, succeed him as CEO [*Id.* at 48 (10/29/2021 Email between Howard and Khatri)]. In 2019,

3

Freeman declined Plaintiff's suggestion to elevate Khatri to Deputy CEO [*See id.* at 46 (04/17/2019 Email between Howard and Freeman)].

But on October 26, 2021, Freeman announced to the Board of Directors of Cherokee Health Systems that he would retire effective January 31, 2022 [*See id.* at 31 (10/26/2021 Board Meeting Minutes at 3)]. As part of the announcement, he recommended that the Board select Khatri to replace him as CEO [*See id.* (10/26/2021 Board Meeting Minutes at 3)].

### C. Plaintiff's Termination

Within a few days of Freeman's announcement, Freeman called Plaintiff to inform him of Freeman's anticipated resignation and recommendation that Khatri become CEO [*See id.* at 74 (Howard Dep. 43:20-23)]. The conversation turned to Plaintiff potentially applying to be CEO [*See id.* (Howard Dep. 43:18-19)]. According to Plaintiff, Freeman told him that "[he] would have the opportunity to apply" and that "nothing was in place" [*Id.* (Howard Dep. 43:25-44:1; 44:14-15)]. Freeman "didn't even think the Board had started" the process of replacing Freeman [*See id.* (Howard Dep. 44:15-16)].

On October 29, 2021, Plaintiff sent an email to Kenneth Knight, Chairman of the Cherokee Health Systems Board, and David Purkey, a Board Member, expressing his interest in applying to be CEO [*See id.* at 49 (10/29/2021 Email between Howard, Knight, and Purkey)]. Plaintiff then emailed Khatri to inform her that "[they were] competing for the same position" [*See id.* at 48 (10/29/2021 Email between Howard and Khatri)]. Khatri's only reply was "I am in shock" [*Id.* at 91 (Deposition of Parinda Khatri ("Khatri Dep.") 30:13)]. Khatri did not respond to further emails or calls from Plaintiff [*See id.* at 94 (Khatri Dep. 30:11-14)]. Khatri sent a text message to Freeman indicating that she could not "believe [Plaintiff] would create division at CHS at this critical time and go against [Freeman's] plan" [*See id.* (Khatri Dep. 52:3-5)]. Thereafter, in late October, Freeman held an unscheduled "meeting" with his assistant Sandra Greear and Khatri to discuss

4

Plaintiff's professed intent to apply for the CEO position. [*See* Doc. 20 at 37 (Deposition of Sandra Greear ("Greear Dep.") 35:7-14); *id.* at 56 (Khatri Dep. 75:13-20)]. That day, Freeman decided "to terminate Plaintiff" [*See id.* at 37 (Deposition of Sandra Greear ("Greear Dep.") 36:3-6)].

On November 1, 2021, Freeman wrote a letter to Plaintiff terminating him [*See* Doc. 12 at 51 (Termination Letter)]. The letter read in pertinent part:

> You have taken recent self-serving actions that have alienated you from all other members of the leadership team, run the risk of creating dissention among the staff, and violated assurances given to me a few hours earlier. I have come to the conclusion that the future of Cherokee Health Systems will be more harmonious and productive without you as Chief Financial Officer.
>
> Therefore, I am terminating your employment with Cherokee Health Systems effective immediately.

[*Id.* (Termination Letter)]. Freeman sent the letter to Plaintiff.

### D. Plaintiff's Letter To The Board

On November 22, 2021, Plaintiff, through counsel, sent a letter to Board Chairman Knight expressing Plaintiff's intent to apply to be CEO [*See id.* at 40 (Post Termination Interest Letter)]. The letter also stated that Freeman provided "no legitimate business reason for his decision to terminate [Plaintiff's] employment" [*Id.* at 41 (Post Termination Interest Letter)]. The letter asserted that Plaintiff's "termination was not the first incident where Mr. Freeman has conducted himself, as CEO, in an inappropriate and illegal manner based upon sex/gender" [*See* Doc. 12 at 41 (Post Termination Interest Letter)]. It also alluded to Freeman's actions towards Rhonda Freeman, Tracey Garner, and Stephanie Hall [*See id.* at 41 (Post Termination Interest Letter); 70 (Howard Dep. 24:9-17; 25:1-20; 32:9-12)]. As relevant, the letter concluded:

> Mr. Howard does not wish to pursue wrongful termination action against Cherokee Health Systems. Mr. Howard wishes to play a role in the success of Cherokee Health Systems. Accordingly, Mr. Howard respectfully requests you and the Board to consider him for the CEO position.
>
> [*Id.* at 41 (Post Termination Interest Letter)].

5

On November 30, 2021, Board Member Nancy Sirianni emailed Chairman Knight and Freeman, copying the rest of the Board [*Id.* at 64-65 (11/30/2021 Sirianni Email)]. Sirianni assessed that "[i]t is very inappropriate for us to be dealing with Mr. Howard directly" because it was "apparent" "after reading the letter from his lawyer, that if we do not give Mr. Howard an interview he will sue Cherokee Health Systems for wrongful termination" and "if we interview him and do not hire him, he will sue Cherokee for wrongful termination" [*Id.* (11/30/2021 Sirianni Email)]. Sirianni thought "it behoove[d]" the Board to refer the matter to "in-house counsel" [*Id.* (11/30/2021 Sirianni Email)]. Chairman Knight thanked Sirianni for her input [*See id.* at 64 (12/1/2021 Knight Email in Response to Sirianni)]. For nearly two (2) weeks no action occurred toward selecting a new CEO or acting on Plaintiff's letter [*See id.* at 59 (12/13/2021 Knight Email to the Search Committee)].

### E. The Board Selects Khatri as CEO

After Freeman announced his intent to resign, Defendant formed a Search Committee. The Search Committee was tasked with "identifying someone to be the next Chief Executive Officer of Cherokee Health" [*See id.* at 36 (Affidavit of Kenneth Knight ("Knight Aff.") ¶ 2)]. A subset of Defendant's Board Members—Michael Covington, David Purkey, William Whited, Joe Haniford, Rosa Mar, and Chairman Knight—made up the Search Committee [*Id.* (Knight Aff. ¶ 3)]. On December 13, 2021, Knight emailed the Search Committee suggesting that it begin the process of finding a new CEO and interview Dr. Khatri first "because of the unique nature of Cherokee Health, [which] suggests strong consideration be given to an in house candidate" and Cherokee Health Systems's "succession plan" [*See id.* at 59 (12/13/2021 Knight Email to the Search Committee); *see also id.* at 62 (12/16/2021 Knight Email to the Search Committee (noting that "a succession plan was adopted by the board several years ago")]. Knight requested that the Search Committee approve a plan (1) allowing "a majority of" the Search Committee to meet

6

Khatri "for lunch [and] get to know [her] better and ask any questions" and (2) then "[f]ollowing [the] meeting," "vote on whether or not to recommend her to the full [B]oard or determine when we want such a committee vote to take place[]" [*Id.* at 59 (12/13/2021 Knight email to the Search Committee)].

Covington responded to the email stating "[f]irst and foremost, I think Jeff Howard has a viable case against Cherokee Health Systems that he could win" because the "last member of the Leadership Team who dared to announce an intention to pursue the CEO position was terminated[]" [*Id.* at 61 (12/15/2021 Covington Email in Response to Knight)]. Covington thought "Freeman fired [Plaintiff] to protect Dr. Khatri and make sure she got the CEO position" [Doc. 20 at 25 (Deposition of Michael Covington ("Covington Dep.") 41:19-42:1)]. Despite Covington's response, the Search Committee members approved the proposed plan [*See* Doc. 12 at 36 (Knight Aff. ¶ 4)]. On January 7, 2021, all of the Search Committee members, except Haniford, met with Khatri [*See id.* (Knight Aff. ¶¶ 4-5)]. Haniford met with Khatri separately [*Id.* at 35 (Affidavit of Joe E. Haniford ("Haniford Aff.") ¶¶ 4-5)].

Once the Search Committee completed its interviews of Khatri, it did not interview Plaintiff, or any other candidate, for the CEO position [*See id.* at 36 (Knight Aff. ¶¶ 7-8)]. Chairman Knight provided two reasons for not interviewing Plaintiff [*See id.* at 96 (Deposition of Kenneth Knight ("Knight Dep.") 17:2-10)]. **First**, Plaintiff "had been terminated," and Knight "trusted that Dr. Freeman would not discharge someone for no reason" [*See id.* (Knight Dep. 17:9-10; 18:1-2)]. **Second**, Knight wished to interview Khatri first and was "favorably impressed with her" [*See id.* at 36 Knight Aff. ¶ 5)].

The entire Search Committee also had a "favorabl[e] impress[ion]" of Khatri [*See id.* (Knight Aff. ¶¶ 5, 7)]. Based on that favorable impression, the Search Committee unanimously

7

decided to recommend that the Board hire Khatri as Defendant's next CEO [*See id.* (Knight Aff. ¶¶ 5, 7)]. On January 25, 2022, the Board unanimously voted to end the search and hire Khatri as CEO [*See id.* at 36 (Knight Aff. ¶ 7); *see also id.* at 28 (Affidavit of Sandra Greear ("Greear Aff.") ¶ 5); *id.* at 32 (01/25/2022 Cherokee Board of Directors Meeting Minutes ("01/25/2022 Board Meeting Minutes" at 1)].

### F. Procedural History

Plaintiff filed suit [*See* Doc. 1]. Plaintiff's operative Amended Complaint raises claims under "Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e," "the Tennessee Human Rights Act ("THRA"), T.C.A. §§ 4-21-101," "and the Tennessee common law of retaliatory discharge[],"[2] [Doc. 6 ¶ 1], based on Plaintiff's November 2021 termination and Defendant's refusal to "consider" "interview" or "hire him" for the CEO position [*Id.* at 7]. Defendant moved for summary judgment on all claims [Doc. 11]. Plaintiff opposed, [*See* Doc. 20], and Defendant replied, [*See* Doc. 22].

## II. Legal Standard

Under Federal Rule of Civil Procedure 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the facts in the light most favorable to the nonmoving party and makes all reasonable inferences that can be drawn from those facts in his favor. *Matsushita*, 475 U.S. at 587; *Nat'l Satellite Sports*, 253 F.3d at 907. The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the

---

[2] Neither Party separately addresses Plaintiff's "common law of retaliatory discharge[]" claim. And the Court sees no reason to do so. The THRA generally "provides the exclusive remedy for employment discrimination lawsuits in Tennessee." *See Williams v. Auto Club Servs., Inc.*, No. 3:21-cv-165, 2021 WL 6497220, *2 (E.D. Tenn. Oct. 4, 2021) (citations omitted).

8

nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586); *see also* Fed. R. Civ. P. 56(c)(1). A dispute over a material fact is only a "genuine issue" if a reasonable jury could find for the nonmoving party on that issue. *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court must grant summary judgment where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### III. <u>Analysis</u>

#### A. **Defendant Is Entitled To Summary Judgment On Plaintiff's Sex Discrimination Claims.**

Title VII prohibits an employer from "fail[ing] or refus[ing] to hire[,]" "discharge[ing] any individual, or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The THRA does too. *See* Tenn. Code Ann. § 4-21-401(a)(1). "The analysis of claims brought pursuant to the THRA is identical to the analysis used for Title VII claims." *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008) (citing *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn.1996)).

Because Plaintiff relies only on circumstantial evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 605 (6th Cir. 2022). Under this framework, Plaintiff bears the burden of establishing a prima facie case of discrimination. *See Levine v. DeJoy*, 64 F.4th 789, 797 (6th Cir. 2023) (citing *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008)). If Plaintiff succeeds, the "burden shifts to" Defendant "'to

9

articulate some legitimate, nondiscriminatory reason for the employee's'" treatment. *See id.* (quoting *Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 253 (1981)). And if Defendant succeeds, the burden shifts back to Plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." *Id.*

At step one of the framework, to establish a prima facie case, a plaintiff must generally demonstrate that "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Id.* (quoting *White*, 533 F.3d at 391). Under binding Sixth Circuit precedent,[3] because Plaintiff is a male bringing a claim for sex discrimination and he is part of the "majority," to make a prima facie case, he must also "show 'background circumstances to support the suspicion that the defendant is the unusual employer who discriminates against the majority.'" *See Ames*, 87 F.4th at 825 (quoting *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008)) (petition for cert. filed). "Plaintiffs typically make that showing with evidence that a member of the relevant minority group," here, females, "made the employment decision at issue, or with statistical evidence showing a pattern of discrimination by the employer against members of the majority group." *Id.*

Here, Freeman, a male, made the decision to terminate Plaintiff, and Plaintiff presented no statistical evidence to support his claim that Defendant was the unusual employer that discriminates against the "majority" [*See generally* Doc. 20]. Instead, citing no legal authority, Plaintiff attempts to establish that Defendant is the "unusual employer" through his own

---

[3] This precedent has been called into question, but the Court is "bound to apply this rule here." *See Ames v. Ohio Dep't of Youth Servs.*, 87 F.4th 822, 827 (6th Cir. 2023) (Kethledge, J., concurring).

10

conclusory opinions and through the opinion of former employee Tracey Garner [*See id*. at 11-12 (Howard Dep. 31:17-21; 31:14-15)]. Garner, who left Defendant in 2012, opined that males could not have a "long-lasting role" at Cherokee Health Systems [*Id.* at 34 (Garner Dep. 33:1-2)]. And Plaintiff testified that "it just seemed that everyone that was advanced was female" [Doc. 12 at 71 (Howard Dep. 32:7-8)]. These opinions are not supported by statistics or policies from which the Court could infer that Defendant treats males unequally as a class. Such conclusory opinions, without more, are not "evidence" for the purposes of establishing Plaintiff's prima facie case. *See Treadwell v. American Airlines, Inc.*, 447 F. App'x 676, 678-79 (6th Cir. 2011) ("'Evidence' requires more than the plural of 'opinion.'").

Plaintiff alternatively argues that Defendant was the "unusual employer" that discriminates against males because Freeman had a history of "protect[ing]" "certain females that got his attention" [Doc. 12 at 70 (Howard Dep. 27:16-18)]. Plaintiff points to three employees to attempt to establish this pattern—Rhonda Freeman, Garner, and Stephanie Hall [*Id.* at 70 (Howard Dep. 24:9-17; 25:1-20; 32:9-12)]. Remember that Freeman dated and then married Rhonda Freeman in 2000 [Doc. 20 at 47 (Howard Dep. 82:16-25; 83:1-5)]. Freeman made sexual advances toward Garner before she left Defendant in 2012 as part of a settlement [*Id.* at 30 (Garner Dep. 12:25-13:21)]. And, Freeman expressed potential interest in dating Hall at some point [*Id.* at 43 (Howard Dep. 32:9-12)]. But even if three anecdotal examples over a twenty-five-year period were a legally sufficient method to establish background circumstances—it is not—what Plaintiff describes is not sex discrimination cognizable under Title VII. Assuming the examples could reasonably be characterized as "protecting" these females, favoring an employee because of a sexual relationship, or potential desire for one, is insufficient to establish discrimination on the basis of sex. *See Hubbard v. Evolution Wireless*, No. 2:19-cv-234, 2021 WL 6333363, at *10 (E.D. Tenn. Dec. 14,

11

2021) (citing *Schobert v. Ill. Dep't of Transp.*, 304 F.3d 725, 733 (7th Cir. 2002) ("Whether the employer grants employment perks to an employee because she is a protegé, an old friend, a close relative or a love interest, that special treatment is permissible as long as it is not based on an impermissible classification . . . . [I]ntra-office romance[] is often bad for morale, but that is different from saying it violates Title VII.")); *see also Briggs v. Univ. of Detroit-Mercy*, 611 F. App'x 865, 872 (6th Cir. 2015). Therefore, Plaintiff has not established a prima facie case.

But even if Plaintiff had established a prima facie case, at step two, Freeman stated that he terminated Plaintiff because Plaintiff's announcement of his intent to seek the CEO position was "self-serving," created a risk of "dissention among the staff," and "violated assurances" Plaintiff purportedly gave Freeman "a few hours earlier" [Doc. 12 at 51 (Termination Letter)]. Freeman stated his conclusion that "the future of Cherokee Health Systems will be more harmonious and productive without [Plaintiff] as Chief Financial Officer" [*Id.* (Termination Letter)]. Thus, Defendant met its burden of producing a legitimate nondiscriminatory reason for Plaintiff's termination, and the burden would shift back to Plaintiff. *See Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 350 (6th Cir. 2021).

At step three, Plaintiff "'must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination.'" *See Jackson*, 814 F.3d at 778 (quoting *Provenzano*, 663 F.3d at 812). Plaintiff can show pretext "in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *See Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir.2004)) (footnote omitted). At bottom,

12

"[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id.* at 400 n.4.

Plaintiff offers three pieces of evidence to attempt to show that Defendant's reason was pretextual. ***First***, he notes that Freeman held an "unscheduled" meeting "about firing Howard on the *same day* they found out that he was applying for the CEO position" [Doc. 20 at 13 (emphasis original)]. But Plaintiff does not elaborate on this argument further [*See id.*]. Holding a meeting about Plaintiff, however, is entirely consistent with Freeman's termination letter, which describes a "risk of dissention among the staff" and notes that the work environment would be "more harmonious" without Plaintiff [*See* Doc. 12 at 51 (Termination Letter)]. To the extent the meeting is relevant at all, this evidence supports Defendant.

***Second***, Plaintiff argues that Board Member Covington "admits" the "proffered excuses are pretexts and that Freeman would not be honest with him" [Doc. 20 at 13 (citing Doc. 20 at 19-20 (Covington Dep. 16:22-17:10))]. This argument stretches Covington's actual testimony too far. Covington testified that Freeman told him that Freeman fired Plaintiff because Freeman "felt like Mr. Howard had lied to him" about whether Plaintiff would "pursue the CEO job" [Doc. 20 at 19 (Covington Dep. 15:16016:10)]. In Covington's opinion, "Freeman fired [Plaintiff] to protect Dr. Khatri and make sure she got the CEO position" [Doc. 20 at 25 (Covington Dep. 41:19-42:1)]. Covington, however, was not part of the decision to terminate Plaintiff and did not learn of the decision until after the termination [Doc. 12 at 77 (Howard Dep. 60:2-24); Doc 20 at 18-19 (Covington Dep. 14:23-15:5)]. And this is not sufficient to establish pretext for sex discrimination.

***Third***, Plaintiff argues that he received a positive performance review shortly before his termination [*See* Doc. 20 at 13, 47 (Howard Dep. 63:11-19)]. If Defendant terminated Plaintiff for poor performance, then this evidence might tend to show pretext. But Freeman did not profess

13

to terminate Plaintiff based on poor performance [*See* Doc. 12 at 51 (Termination Letter)]. Instead he relied on dissention among staff, distrust, and the desire for a harmonious and productive work environment [*See id.* (Termination Letter)]. Accordingly, a jury could not reasonably conclude that the stated reasons were pretext for unlawful sex discrimination. *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).[4]

Freeman took actions that may give one pause, but Title VII is not a "general civility code for the American work place." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). And it does not license the Court to punish all unprofessional conduct in the workplace, only "*discriminat[ion]* . . . because of . . . sex." *See id.* (emphasis added). Accordingly, the Court grants Defendant summary judgment on Plaintiff's sex discrimination claims.

### B. Defendant Is Entitled To Summary Judgment On Plaintiff's Retaliation Claims.

Under both Title VII and the THRA, an employee may bring an action against an employer for retaliating against the employee for opposing a discriminatory practice. 42 U.S.C. § 2000e-3(a); Tenn. Code Ann. § 4-21-301(a). These claims are evaluated identically under Title VII and the THRA. *See Kirkland v. City of Maryville*, 54 F.4th 901, 911 (6th Cir. 2022). The familiar *McDonnell Douglas* framework applies here too because Plaintiff relies only on circumstantial evidence.

---

[4] Plaintiff's claim is not saved by his wholly undeveloped assertion that Freeman was acting as "cat's paw" for Khatri [*See* Doc. 20 at 10]. An employer is liable under a "cat's paw" theory "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action," and "that act is a proximate cause of the ultimate employment action[.]" *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 351 (6th Cir. 2012) (alterations in original) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)). Khatri was not Plaintiff's supervisor, nor did Plaintiff offer a shred of evidence that she harbored a discriminatory animus against males.

14

To establish a prima facie claim for retaliation Plaintiff must show that (1) he engaged in a protected activity, (2) Defendant knew of his conduct, (3) Defendant took an adverse employment action against him after his protected conduct, and (4) there was a causal connection between the exercise of Plaintiff's protected right and the adverse action. *See Wehrly v. Allstate Ins.*, No. 23-5736, 2024 WL 1308245, at *4 (6th Cir. May 27, 2024) (citing *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014)). Establishing an adverse employment action in a retaliation context is "less onerous" than in a discrimination action. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595-96 (6th Cir. 2007). However, proving causation is more difficult because "Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).[5]

Here, Plaintiff can establish the first three prongs of the prima facie case as they relate to his post-termination attempt to become CEO. Defendant agrees that Plaintiff's November 22, 2021 letter to the Board characterizes his termination as an instance "of sex discrimination[]" that Plaintiff opposed. [*See* Doc. 12 at 20]. Although Plaintiff has not shown that his termination equates to discrimination based on his sex, "[a] person opposing an apparently discriminatory practice . . . must only have a good faith belief that the practice [of which he or she complains] is unlawful." *See Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 511 (6th Cir. 2016) (quoting

---

[5] Defendant moved for summary judgment on Plaintiff's claim for (1) retaliatory discharge and (2) retaliation in connection with his post-termination attempt to become CEO. Either Plaintiff did not intend to bring a retaliatory discharge claim or he has abandoned any such claim because he did not respond to this portion of Defendant's Motion [*See* Doc. 12 at 18-19]. Even if Plaintiff intended to, and did, bring a retaliatory discharge claim, Defendant is entitled to summary judgment. Plaintiff's November 22, 2021 letter was the first time he "expressed the belief that Dr. Freeman was discriminating on the basis of sex" [Doc. 12 at 73 (Howard Dep. 37:6-25; 38:1-8)]. This protected activity could not be the cause of his termination, which occurred twenty-one (21) days earlier. *See Hymes v. Dep't of the Air Force*, No. 23-3210, 2024 WL 1024951, at *4 (6th Cir. Feb. 12, 2024).

15

*Booker v. Brown & Williamson Tobacco Co.* 879 F.2d 1304, 1312-13 (6th Cir. 1989)). Plaintiff demonstrated such a belief [*See* Doc. 20 at 43 (Howard Dep. 34:6-10)]. And members of the Board were aware of Plaintiff's letter [*See, e.g.*, Doc. 12 at 64 (11/30/2021 Sirianni Email)]. Moreover, the Search Committee's decision not to interview Plaintiff and Board's decision not to hire him are adverse employment actions that occurred after the Board received his letter. *See Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 664 (6th Cir. 2020) (failure to rehire); *Williams v. Nashville Network*, 132 F.3d 1123, 1132 (6th Cir. 1997) (failure to interview).

Plaintiff, however, fails to establish a causal connection between his letter and Defendant's decision not to interview him or hire him as CEO. "[T]emporal proximity considered with other evidence of retaliatory conduct" may be sufficient to establish that protected activity was the but-for cause of an adverse action. *See Little v. BP Expl. & Oil Co.*, 265 F.3d 357, 364 (6th Cir. 2001). But "[t]emporal proximity on its own is usually not sufficient." *Zandvakili v. Univ. of Cincinnati*, No. 23-3396, 2024 WL 278548, at *8 (6th Cir. Jan. 25, 2024) (citing *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020)). For temporal proximity to stand alone, the adverse action generally must be "taken just days or weeks from when the employer learns of the employee's protected activity." *See George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir. 2020).

Here, Plaintiff must show more than temporal proximity to succeed. The Search Committee started its search with the in-house candidate, Khatri, and agreed to interview additional candidates if the Search Committee was not satisfied with the in-house candidate [*See* Doc. 12 at 59 (12/13/2021 Knight Email to the Search Committee)]. So, the decision not to interview or rehire Plaintiff occurred on the day the Search Committee recommended and then the Board approved Khatri to replace Freeman—on January 25, 2022. [*See id.* at 32 (01/25/2022 Board Meeting Minutes at 1); *see also id.* at 36 (Knight Aff. ¶¶ 4, 7-8)]. That was sixty-four (64) days after

16

Plaintiff sent his letter to the Board. This, alone, is not enough to establish causation. *See Zandvakili*, 2024 WL 278548, at *9; *Williams v. Memphis Light, Gas & Water*, No. 23-5616, 2024 WL 3427171, at *9 (6th Cir. July 16, 2024).[6]

The only "other evidence" Plaintiff marshals is the email from Board Member Sirianni recommending that the Board turn the matter over to in house counsel after Plaintiff threatened legal action [*See* Docs. 20 at 13; 12 at 64 (11/30/2021 Sirianni Email)]. But Sirianni was not on the Search Committee, and she was only one vote in the unanimous decision to elevate Khatri to CEO. [*See id.* at 64-65 (11/30/2021 Sirianni Email); *see also id.* at 36 (Knight Aff. ¶ 2)]. Without offering more, Plaintiff fails to show that his complaint of sex discrimination was the but-for cause of (1) the Search Committee's decision not to interview and recommend him or (2) the Board's decision not to hire Plaintiff as CEO. *See Zandvakili*, 2024 WL 278548, at *8 ("[C]ollective decision-making is less susceptible to influence by an individual with a retaliatory motive." (quoting *Strong v. Univ. Healthcare Sys., LLC*, 482 F.3d 802, 806 n.2 (5th Cir. 2007)).

Further, even if Plaintiff made his prima facie case, at step two, Chairman Knight, on behalf of Defendant, gave two reasons why he chose not to interview Plaintiff [*See* Doc. 12 at 96 (Knight Dep. 17:2-10)]. **First**, Plaintiff "had been terminated" and Knight "trusted that Dr. Freeman would not discharge someone for no reason" [*See id.* at 96 (Knight Dep. 17:9-10; 18:1-2)]. **Second**, Knight wished to interview Khatri first and was "favorably impressed with her" [*See id.* at 36

---

[6] Plaintiff argues that the Court should assess temporal proximity starting on the date Chairman Knight recommended that the Search Committee interview Khatri before "conduct[ing] a big nationwide search" [*See* Doc. 20 at 13; *see also* Doc. 12 at 59 (12/13/2021 Knight Email to the Search Committee)]. But merely deciding to interview Khatri first and then, if necessary, interview other candidates is not an adverse action. *See George*, 966 F.3d at 460 (stating the relevant temporal connection is between the date "when the employer learns of the employee's protected activity" and the "adverse action"). And the record does not show that the Search Committee decided not to interview Plaintiff before January 25, 2022.

17

Knight Aff. ¶ 5)]. These are nondiscriminatory reasons. *See Smyer v. Kroger Ltd. P'ship I*, No. 22-3692, 2024 WL 1007116, at *4 (6th Cir. Mar. 8, 2024); *see also Jackson*, 999 F.3d at 350. Defendant acted in accordance with its "succession plan" by giving "strong consideration" "to an in-house candidate" and ultimately hired from within [*See* Doc. 12 at 32-34 (01/25/2022 Board Meeting Minutes at 1-3); *see also id.* at 59 (12/13/2021 Knight Email to the Search Committee)]. Both the Search Committee and the Board were so impressed with Khatri, that the search ended [*See id*. at 32-34 (01/25/2022 Board Meeting Minutes at 1-3)].

With the burden shifting back to Plaintiff, at step three, he has not attempted to show any evidence indicating that Defendant's stated reasons were a pretext for retaliation. And upon the Court's review, there is no evidence that would permit a jury to infer that Defendant "made up its reason to conceal intentional discrimination" based on Plaintiff's protected activity. *See Chen*, 580 F.3d at 400 n.4. This too is independently fatal to Plaintiff's claims. Accordingly, the Court grants Defendant summary judgment as to Plaintiff's claims for post-termination retaliation.

## IV. Conclusion

For the reasons stated above the Court **GRANTS** Defendant Cherokee Health Systems's Motion for Summary Judgment [Doc. 11] and **DISMISSES** this action. An appropriate judgment shall enter.

SO ORDERED.

_____
KATHERINE A. CRYTZER
United States District Judge

18